NOTE. As to accommodation bill transactions: Ex parte Mee, 1 Ch. App. 337; Downing v. Traders' Bank [Case No. 4,046]; Ex parte Hammond, 6 De Gex. M. & G. 699; 24 Law J. (Bankr.) 2; In re Mortimore, 7 Jur. (N. S.) 320, 9 Wkly. Rep. 423, 3 L. T. (N. S.) 828; Bassett v. Dodgin, 9 Bing. 653; 2 Moore & S. 777.

## Case No. 2,878.

### In re CLEMENS.

[8 N. B. R. 279;[1] 5 Chi. Leg. News, 511; 5 Leg. Op. 116; 2 Am. Law Rec. 171; 8 Am. Law Rev. 168.]

District Court, E. D. Missouri. July 25, 1873.

ACT OF BANKRUPTCY—SUSPENSION OF PAYMENT OF COMMERCIAL PAPER.

The endorser of a promissory note or bill of exchange, who, after due protest and notice, fails to provide for payment of his liability within fourteen days, thereby commits an act of bankruptcy, and may be adjudged a bankrupt upon the application of a petitioning creditor, and it matters not whether the paper be endorsed for accommodation or in the course of business.

[In bankruptcy. Petition by Morris Langsdorf that John Clemens be adjudicated a bankrupt. Clemens answered, and showed cause, and the petitioner demurred to the answer as insufficient.]

---

[1] [Reprinted from 8 N. B. R. 279, by permission. 8 Am. Law Rev. 168, contains only a partial report.]

TREAT, District Judge. The defendant, against whom the petition is filed, does not deny that he belongs to the class the suspension of whose commercial paper for fourteen days is an act of bankruptcy. The petitioning creditor avers that he is the holder for value of a negotiable promissory note for three thousand dollars of which Christian Staehlin is the maker and the defendant the first endorser, and that said note was presented for payment, protested for non-payment, and notice thereof duly given to the defendant. There are several endorsers of the note. The petition alleges an act of bankruptcy as follows: "And your petitioner further represents that within the six calendar months next preceding the date of this petition the said John Clemens, being insolvent and in contemplation of insolvency and bankruptcy, did commit an act of bankruptcy within the meaning of the act, to wit: In that the said John Clemens did heretofore, to wit: on the 12th day of May, 1873, being a merchant, manufacturer and trader, suspend, and did not resume payment of his commercial paper within a period of fourteen days, nor at any time thereafter." Defendant avers that he endorsed the note set out in the creditor's petition, and several others made by said Staehlin, solely for the accommodation of Staehlin; that said notes were not made or endorsed in the name of, or in connection with, defendant's own business; that said notes have remained past due more than fourteen days; that no notes made by the defendant are past due; that the only notes outstanding and past due on which his name appears are those so endorsed by him for Staehlin's accommodation, the same being in nowise connected with defendant's business; and that "he is not insolvent, but is fully able to pay his own debts in full, contracted in or about his own business."

The present purpose of the answer is to obtain the ruling of this court on the several propositions involved, concerning which there are conflicting opinions. In a few of the earlier cases decided under the bankrupt act, doctrines were announced by some of the district courts to which this court never assented. To interpret this law it is necessary to keep strictly in view the cardinal canon of construction, which requires reference to all its parts and to its scope and object. Its main purpose is, while furnishing relief to unfortunate debtors, to secure equality among creditors. Another important object is to prevent over trading by requiring those whose commercial paper is put into circulation to meet it promptly according to the law merchant, if they embark in any of the classes of business specified.

Without going into a review of decided cases, with a labored analysis of the act of congress, it must suffice for the present

case to say that, in the opinion of this court, as often heretofore held, the clause in question does not mean that the suspension of payment for fourteen days of one piece [or more][2] of commercial paper is an act of bankruptcy, irrespective of the circumstances under which the suspension occurred. In Doan v. Compton [Case No. 3,940], and in Re Brown, Webber & Co. [Id. 1,973], as well as in other cases decided by this court, it was held that the suspension contemplated was a general suspension, or a suspension from financial inability to meet one's indebtedness as it matures, and not a suspension with respect to some paper the liability to pay which is honestly questioned, it being supposed bona fide that a good defence thereto existed; nor a suspension through mere inadvertence, the ability to pay being clear, and tender made as soon as the inadvertence was known; so of a suspension at the instance of the holders of the paper pending negotiations for renewals, &c. In this respect this court has differed from some other district courts, as it does also on the following points, on which it holds that by "commercial paper" the act of congress does not mean only such paper when issued in connection with one's own mercantile, trading, banking, manufacturing or mining business—or what is sometimes denominated "business paper." Some courts have ruled that such paper, when given for money borrowed, though for the purpose of conducting the business described, is not within the meaning of the act, a construction wholly irreconcilable with the scope and object of the law. The doctrine held by most of the courts is the correct one, that the term "commercial paper" means all negotiable paper known as such by the law merchant as modified by the statute of Anne and the various American statutes.

It seems obvious that, when congress applied a special rule concerning commercial paper to specified pursuits, it did so to enforce punctuality of payment. In addition to ordinary days of grace it allowed the fourteen days, within which a merchant, if solvent, ought to be able to take up his paper or make satisfactory arrangements therefor. It is well known that many business men holding such paper rely on its prompt payment to enable them to meet their own obligations at maturity and that the failure of one to pay promptly may affect not the holder of his paper alone but the creditors of the holder. Indeed, in the present modes of business, the non-payment of such paper by one may produce serious consequences to many who are successively creditors of each other. The reasons for insisting upon such prompt payment are so urgent that some judges have erroneously held that any one who issued commercial paper is a merchant, within the meaning of that term as used in the act of congress, irrespective of his real occupation. If the origin of the paper is to determine whether it is "commercial" or not, the elemental qualities of such paper are destroyed, for it loses in the hands of a bona fide endorser for value, the element of certainty which the law merchant imposes. Being for a sum certain, payable at a specified time, such an endorsee is not affected by any equities existing between the original parties. Each endorser contracts with his immediate endorsee and all subsequent endorsees, for the payment of the sum named, and the contract of the maker is not more definite under the law merchant than is the contract of endorser. As to bona fide endorsers for value it is immaterial whether endorser put his name to the paper merely to accommodate the maker or not. The very object of such an endorsement was to give the paper currency—make it negotiable under the law merchant with all the qualities that the law imposes. Why, therefore, there should be any distinction between an accommodation or other endorser, where the plaintiff in a suit or a petitioning creditor is a bona fide endorser for value, is not apparent. It is immaterial whether the paper is "business paper" so-called, or "accommodation paper," for it is commercial paper, and the liability of the endorser is the same under the act of congress as it is under the law merchant.

The act of congress declares that those who embark in the pursuits specified shall punctually meet their obligations evidenced by commercial paper. That paper may pass through many hands, not on the faith of the maker alone, but mainly, and sometimes solely, on the faith of the endorser's name. The endorser has contracted to pay if there is non-payment at maturity, and notice to him is duly given. If that endorser is a merchant and fails to meet his endorsement when his liability is fixed, his indebtedness is to that extent increased to the detriment of his other creditors—possibly to their great loss. It is of no less moment to his creditors that he has become insolvent through [accommodation indorsement than if he became insolvent through][3] business disasters. It may be that he sells merchandise and takes negotiable paper therefor, which, after being discounted in bank with his endorsement, he has to meet, through the failure of the maker; and why any court could suppose that the bankrupt law, which looks to the rights of creditors as well as the obligations of debtors, intends, what it nowhere says, that insolvency caused by "accommodation" endorsements is not insolvency within the meaning of the law, but that insolvency otherwise caused is within the law. Why such a distinction should be drawn is not reconcilable with any well

considered views of the legal relationship of the parties. Congress evidently designed to have merchants, traders, bankers, &c., keep good their commercial paper, whether they were makers or endorsers. If, through misfortune, they become insolvent, whether from the one or the other cause the same result follows in law and fact. It is then for them to seek the relief the bankrupt act provides, or for their creditors to resort to its provisions in order to secure an equal distribution of the bankrupt's assets.

It is unnecessary to go into the analysis as carefully made by others or to repeat the reasons so forcibly urged by Lowell, J., in Re Chandler [Case No. 2,591]. His conclusions, on the points at issue, this court holds to be correct. The case at bar illustrates the subject. The defendant "avers that he is not insolvent, but is fully able to pay his own debts in full, contracted in and about his own business." That averment is based on the hypothesis that the cause of insolvency affects the question. The liability of the defendant on the Staehlin notes has so swollen his indebtedness, it would seem, that he cannot aver his ability to meet all his obligations. If his property is to be seized on execution to pay these endorsements, and thereby his other creditors suffer, the equality among creditors is destroyed, and the same result would follow if his other creditors absorb his assets, to the loss of those to whom he is indebted on these endorsements. If he cannot pay all his indebtedness, the law demands that all his creditors shall share pro rata.

There is one view not presented in argument, which seems to have weighed with no little force, with some persons, against the conclusions reached, and that is, that even supposing Staehlin were unable to pay the whole of his debts, it might be that the defendant's pro rata share of Staehlin's assets added to his own would leave him ultimately a surplus. This view would apply more strongly to the last of the four endorsers, for if he took up this paper and all four who precede him on the paper should go into bankruptcy, it might be that his distributive shares, out of their respective estates would nearly equal his whole liability on these notes, leaving him far from insolvent, ultimately. To this view is opposed the evident design of the bankrupt act as to prompt payments by merchants. It is not, as the United States supreme court holds, and as all the courts have held, dependent on the ultimate outcome of a merchant's affairs whether he is solvent or not, but a merchant is "insolvent" in the sense intended by the act of congress when he is unable to pay his debts as they become due in the ordinary course of business. Toof v. Martin [18 Wall. (80 U. S.) 40]. Hence, when that condition exists, creditors are not bound to wait unpaid until the ultimate winding up of a merchant's affairs determines whether he can pay in full or not. Were it so, the creditors might from that delay be themselves fatally crippled. Prompt and full compliance with the obligations imposed by the law merchant is what the act of congress exacts from all parties to commercial paper. As some of the courts say: Congress, in this respect, adopted the general mercantile view, viz: That when a merchant lies under protest he has suspended payment or failed. Whether temporarily or permanently, still it is a present suspension or failure. Recognizing that view congress deemed it wise that such suspension, unless followed by resumption within fourteen days, should entitle any creditor to cause the assets of the debtor to be subjected to the payment of all creditors' lawful demands—that is, when the suspension and non-resumption occur under the circumstances mentioned at the commencement of this opinion.

As this question can be reviewed by Judge DILLON at chambers, there need be no delay in procuring a reversal, if his views differ from what are here presented. The doctrine ought to be settled for this circuit as early as practicable. The demurrer is sustained.

[NOTE. Clemens brought the case to the circuit court by petition of review, and that court reversed the order sustaining the demurrer. See Case No. 2,877, next preceding.]